UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| HOLLY CARBON and KENNETH CARBON, and the Marital Community Thereof,<br><br>Plaintiffs,<br><br>v.<br><br>SEATTLE REPRODUCTIVE MEDICINE, INC., P.S., a Washington Professional Service Corporation,<br><br>Defendant. | NO.<br><br>**COMPLAINT**<br><br>**JURY DEMAND** |

Plaintiffs Holly Carbon and Kenneth Carbon and the marital community thereof (jointly "Carbons") bring this action against Defendant Seattle Reproductive Medicine, Inc., P.S. ("SRM") and allege the following:

### I.   PARTIES

1. Plaintiff Holly Carbon ("Holly") is a citizen of Comal County, Texas.

2. Plaintiff Kenneth Carbon ("Kenneth") is a citizen of Comal County, Texas.

3. At all times relevant herein, SRM was and is a Washington professional service corporation which has, on information and belief, its principal place of business located at 1505 Westlake Avenue N., Suite 400, Seattle, WA 98109. SRM also advertises practice

COMPLAINT AND JURY DEMAND - 1



2000080.02

locations in Tacoma, Bellevue, Spokane and Kirkland, Washington.

4. SRM was and is in the business of providing various services to the public. Its services include cryopreserving and storing embryos and sperm for in vitro fertilization ("IVF").

## II. JURISDICTION AND VENUE

5. This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332. The parties are citizens of different states and the amount in controversy exceeds $75,000.

6. Venue is proper in the United States District Court for the Western District of Washington pursuant to 28 U.S.C. § 1391(b). The Defendant is a resident of this District and a substantial part of the events or omissions giving rise to this action occurred in this District.

## III. FACTS

7. Holly is currently 32 years old. Kenneth is currently 39 years old. The Carbons were married in October 2012 and, throughout their relationship, they have wanted to have their own children. Kenneth has served over 20 years in the Army. Holly made a career choice of elementary education, desiring to be in a career that was family-friendly and child-centered.

8. In May 2014, the Carbons moved to Joint Base Lewis-McCord ("JBLM"), Washington, when Kenneth began a position of Platoon Sergeant at 5th BN 5th Air Defense Artillery Regiment, US Army-JBLM. Holly continued in her field of elementary education.

9. The Carbons had begun their first attempts at natural conception in 2013. Sadly, they were unsuccessful. Doctors found no medical reasons for their infertility, aside from Kenneth's diminished sperm count.

10. After 30 months of failed attempts at natural conception, and two painful surgeries in Oklahoma to further investigate Kenneth's lack of sperm count, the Carbons began

COMPLAINT AND JURY DEMAND - 2



investigating IVF in July 2015, at Madigan Army Medical Center ("MAMC") in Tacoma, Washington. This was a long process which started with a barrage of medical tests, attending a class, and receiving a power point presentation.

11.     The Carbons were told by MAMC that there are multiple steps in the IVF process which involve harvesting eggs surgically, which are then fertilized with sperm in a laboratory. If the process is successful, one or more embryo(s) are produced. Once the eggs have been fertilized into an embryo, they are cultured for two to six days in a growth medium. The embryo(s) is/are either implanted or cryopreserved (aka vitrification).

12.     The Carbons underwent six weeks of drug therapy designed to hyper-stimulate Holly's reproductive system into producing multiple eggs as part of her monthly cycle.

13.     The Carbons committed to undergoing IVF as they believed it was their only hope for having children. This decision was difficult to make because IVF is an invasive, arduous and technical process, involving multiple surgical procedures, laboratory fertilization and manipulation, and an intensive drug regimen. As well, IVF is typically an expensive process.

14.     MAMC informed the Carbons that if they were successful in producing more than one embryo, and chose to freeze any of them, embryo banking would be done at SRM, because MAMC did not provide that service. The Carbons ultimately agreed to do so and put their trust in SRM's professionals to bank and protect their embryos.

15.     To further prepare, Kenneth underwent two invasive surgeries to ensure a day of sperm sample would be viable. He conducted several sperm collections to validate presence of motile sperm. Kenneth produced only 43 the day of the IVF egg retrieval.

16.     To prepare for the procedure, Holly attended many doctor appointments over the

COMPLAINT AND JURY DEMAND - 3

Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224 | Fax 206.583.0359

2000080.02

course of almost two years. She had to undergo numerous ultrasounds and blood tests, and a very painful procedure called a hysterosalpingogram. All of these tests were used to determine when Holly's body was ready to begin hormonal injections, as well as to determine her ovulation cycle.

17. Another treatment involved the use of drugs to stimulate ovulation in order to increase Holly's egg production, and thereby increase the chances for success. The drugs were administered daily by needle for over six weeks.

18. During this time frame, Holly went to MAMC's office for follow-up examinations and blood tests, which were used to calibrate her drug regimen. She took time off from work to attend all the appointments and monitoring.

19. Added to this inconvenience, the physical and emotional side effects of this hormone treatment were difficult on Holly. On direction from MAMC, Holly had to give herself three different injections per day in varying amounts. These medications subjected Holly to other risks.

20. The Carbons incurred significant out of pocket costs for the IVF procedure.

21. On the day of the Carbons' egg retrieval surgery, September 18, 2015, MAMC extracted 16 eggs which were fertilized with Kenneth's sperm in MAMC's laboratory.

22. After fertilization and maturation to blastocyst, three viable embryos were produced.

23. The implant of one of the three embryos was successful and the Carbons' son, M.C., was born in 2016.

24. The Carbons agreed that their other two viable embryos would be cryo-preserved and banked at SRM.

COMPLAINT AND JURY DEMAND - 4



2000080.02

25. SRM's website stated, *inter alia*, the following:

> Our standards are stringent; we use only the most recent technology and methods. On-site laboratories enable us to provide patients with results quickly and expedite their care plans.

Under the section of SRM's website for "embryo banking," SRM made the following representations:

> Embryo banking involves in vitro fertilization (IVF) followed by embryo biopsy and freezing for preimplantation genetic testing (PGT). PGT results show which embryos are chromosomally normal ('euploid') and able to be kept frozen for potential future thaw and transfer.

26. The Carbons relied upon SRM's representations regarding its purportedly high standards of care, treatment, methods and technology.

27. In or around August 2015, the Carbons received a welcome letter and pricing guidelines from SRM. The Carbons contracted with SRM and paid SRM $900 for cryopreservation, and $40 per month to store the two remaining embryos.

28. SRM acknowledged that, as of approximately September 23, 2015, it was in possession of two of the Carbons' cryopreserved embryos.

29. The Carbons moved to Texas in approximately June 2017, when Kenneth began a position of First Sergeant at Charlie Battery 1st of the 44th Air Defense Artillery Regiment, US Army, Fort Hood, Texas. Holly, at that time, was a stay at home mom with Michael, from approximately September 2015, to approximately August 2018. In approximately August 2018, Holly began employment as a teacher at an elementary school in Killeen, Texas.

30. In or about February 2018, the Carbons met with medical staff at Baylor Scott & White Medical Center in Temple, Texas ("BSW").

31. In approximately March 2018, the Carbons traveled from Texas to Washington. Monitored by BSW, Holly underwent a second frozen embryo transfer and implant of one of

COMPLAINT AND JURY DEMAND - 5

Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224 | Fax 206.583.0359

2000080.02

the two remaining embryos which was cryopreserved at SRM. The implant took place on or about March 22, 2018. Unfortunately, the March 22, 2018 implant of the second embryo resulted in a miscarriage.

32. Accordingly, as SRM acknowledged, after March 22, 2018, SRM had a single remaining embryo belonging to the Carbons in its possession.

33. The Carbons agreed to have their remaining embryo transferred from SRM to the embryologist team at BSW.

34. SRM informed the Carbons, and the Carbons understood from SRM, that SRM would determine and employ the correct procedure for transferring their embryo to BSW, and follow that procedure.

35. In or about April 2018, the Carbons directed SRM to transfer their single frozen embryo in SRM's possession to BSW. On or about May 1, 2018, SRM gave the Carbons a document entitled "Consent to transfer cryopreserved in vitro pre-implantation embryos, eggs, sperm or tissue specimen from SRM to another facility," which reflects one embryo to be transferred, date frozen 092315, ID number ***2624. ID number ***2624 was Holly's patient ID number at SRM.

36. The Carbons signed all the paperwork required for the transfer as demanded by SRM and instructed SRM to ship the embryo to BSW.

37. SRM assured the Carbons that SRM's laboratory team had placed the straw containing their remaining embryo in the tank and SRM informed the Carbons that SRM had shipped a container to BSW.

38. At all relevant times, the Carbons paid SRM for storage of the embryos. SRM also charged the Carbons for the transfer of the Carbons' last remaining embryo to BSW. The

COMPLAINT AND JURY DEMAND - 6

Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224 | Fax 206.583.0359

2000080.02

Carbons also had to pay BSW to rent a container and for shipping and receiving of the embryo.

39.     The Carbons had already begun preparing for the embryo implant. Again, Holly underwent a barrage of bloodwork, tests, and doctor visits to prepare for the implant. Holly optimized her diet and exercise schedule to make her body receptive. She also monitored her stress and anxiety levels.

40.     The embryo transfer was scheduled at BSW on July 16, 2018.

41.     On July 16, 2018, about one hour before starting the drive to BSW in Temple, Texas, the Carbons received a telephone call from BSW. BSW informed the Carbons that BSW had received the shipment from SRM, but that it contained no embryo. BSW informed the Carbons that when the BSW embryologist team had attempted to thaw the contents of the straw that morning to prepare it for the transfer, BSW found it completely empty. Not only was there no sign of the embryo, but there was not even any sign of any embryo debris.

42.     The Carbons were extremely upset, confused and shocked by the news that their only remaining embryo, which they had cryopreserved at SRM for almost three years, was lost or missing. On July 16, 2018, the Carbons contacted SRM to inform SRM of the situation. The Carbons demanded to know where their embryo was, but the Carbons received no explanation from SRM.

43.     To add further insult and distress to this already extraordinarily painful and emotionally charged situation, after July 2018, SRM continued to send the Carbons invoices for "handling and/or conveyance of specimen for transfer," claiming the Carbons' account was past due, and threatening to send the account to collections.

44.     Since July 16, 2018, the Carbons have been distraught. Their dreams of having another child together, and a sibling for Michael, were destroyed. The Carbons have attended

COMPLAINT AND JURY DEMAND - 7

Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224 | Fax 206.583.0359

2000080.02

counseling and joined online support groups. The Carbons remain deeply traumatized by the loss of their last viable embryo. Kenneth has experienced serious depression.

45. Holly has suffered from extreme depression and anxiety. She has returned to work to save money to potentially try another IVF cycle. Holly's work production has suffered due to the depression and emotional toll of losing the Carbons' last embryo without any explanation.

46. Based on Kenneth's low sperm count, it is very possible that he may not be able to father another child. Holly would have to undergo significant preparation for IVF.

47. As a consequence of this loss, various steps would be required before the Carbons could perform another IVF cycle. The Carbons would have the expense of retrieval surgery, repetition of blood work and tests required for a new IVF cycle.

48. The destruction and/or loss of the Carbons' last remaining embryo was due to the reckless, negligent, and/or knowing conduct of SRM. The preservation procedures employed by SRM were obviously insufficient to protect against the improper loss, or destruction of the cryopreserved embryo, which the Carbons entrusted with SRM.

49. As a result of SRM's destruction or loss of the Carbons' embryo, the Carbons have lost irreplaceable and highly valuable property. Their damages, at least in part, stem from their loss of precious property. The Carbons have suffered extreme emotional distress and grief regarding the loss of their embryo, the prospect of their family suffering the extreme pain and extreme emotional distress from undergoing the process again (if possible and if affordable), and the fact that they may now not be able to have another child.

50. The Carbons' severe distress has impacted all facets of their lives, including interfering with their jobs, marriage and other personal relationships. Although they continue

COMPLAINT AND JURY DEMAND - 8

Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224 | Fax 206.583.0359

2000080.02

to try and come to terms with their grief, the Carbons struggle with the immensity of this unnecessary loss.

51. The Carbons are almost four years older today than they were when they first began the IVF process, and the possibility of not being able to have another child is devastating to them.

52. In a best case scenario, the Carbons would be required to incur the financial and emotional costs of undergoing another painful and drawn-out IVF cycle which likely has a low level of success of producing another viable embryo. Kenneth has also been forced to make the difficult decision to retire from the U.S. Army later this year because in order to go through another IVF process, he cannot be deployed.

### IV. FIRST CAUSE OF ACTION – BREACH OF CONTRACT

53. The Carbons incorporate all preceding paragraphs by reference.

54. The Carbons had a written agreement with SRM, whereby SRM promised to cryopreserve, store, and safeguard any and all embryos that the Carbons did not immediately use, and safely and properly transfer any and all embryos as directed by Carbons.

55. There was a meeting of the minds between the Carbons and SRM that SRM would use its best efforts to care for and safeguard these embryos, would notify the Carbons immediately if there was any problem, and would utilize and/or dispose of the embryo only in the manner and at the time directed by the Carbons, and that the Carbons would pay for said services.

56. The Carbons provided consideration for these services and upheld their end of the bargain by paying all costs, including storage and transfer fees.

57. The Carbons and SRM intended that both sides would be held to their end of the

COMPLAINT AND JURY DEMAND - 9

Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224 | Fax 206.583.0359

2000080.02

bargain.

58. SRM breached its obligation to the Carbons by destroying, losing, or otherwise improperly disposing of the precious and irreplaceable embryo that Carbons entrusted to SRM's care.

59. The damages incurred by the Carbons were exacerbated by SRM's failure to immediately notify the Carbons upon the destruction, loss, or other improper disposal of their embryo and/or by failing to have procedures in place to prevent the unauthorized destruction, loss, or other improper disposal. This delay by SRM further eroded the Carbons' chances for successfully replacing the embryo and ultimately eroded their chances for successfully bearing their own children.

60. As a direct and proximate result of SRM's breach of contract, the Carbons have suffered monetary and property losses, and have suffered severe emotional, physical, and economic damages in an amount well in excess of $75,000 and to be proven at trial. The Carbons' have experienced a significant and traumatic deprivation of their ability to have children. Holly's damages also include the expenses and toll of the process of egg stimulation and retrieval, and preparation for the procedure, which involved weeks of injections, mood swings from hormone changes, uncomfortable bloating, weight gain, and submission to anesthesia during the actual procedure.

61. The Carbons are entitled to recover damages as a result of SRM's breach of contract.

### V.     SECOND CAUSE OF ACTION – NEGLIGENCE

62. The Carbons incorporate all preceding paragraphs by reference.

63. SRM had a duty to use reasonable care in the storage and maintenance of the

COMPLAINT AND JURY DEMAND - 10



2000080.02

Carbons' cryopreserved embryo. SRM had a duty to impose reasonable policies and procedures to ensure that the Carbons' directives and wishes were competently and faithfully followed.

64. SRM had a duty of care based on its undertaking to render cryopreservation and storage services to the Carbons, and SRM had a duty to perform these services with a reasonable degree of care.

65. SRM knew, or should have known, that its failure to exercise such care posed a great risk of harm to the Carbons.

66. The Carbons relied on SRM to meet its duties of care to them and placed their embryos in SRM's care.

67. SRM breached its duties by negligently, recklessly, and/or knowingly destroying, discarding, losing, or otherwise improperly disposing of the Carbons' embryo, and by failing to have, implement, and/or follow policies and procedures which would have prevented such negligent, reckless, and/or knowingly improper loss or destruction.

68. SRM further exacerbated the damages caused by its failures to meet its duties of care by failing to notify the Carbons immediately upon the destruction, loss, or other improper disposition of their embryo.

69. As a direct and proximate result of SRM's negligence, the Carbons have suffered extreme emotional, physical, property, and economic losses in an amount well in excess of $75,000 and to be proven at trial.

70. The Carbons are entitled to recover all such damages as a result of SRM's negligence.

/ / /

/ / /

COMPLAINT AND JURY DEMAND - 11

Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224 | Fax 206.583.0359

2000080.02

## VI. THIRD CAUSE OF ACTION – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

71. The Carbons incorporate all preceding paragraphs by reference.

72. SRM had a duty to avoid the negligent infliction of mental distress, and SRM owed a duty to the Carbons, who were foreseeably endangered by SRM's negligent and/or reckless conduct in destroying, discarding, losing, or otherwise improperly disposing of the Carbons' embryo.

73. As a direct and proximate result of SRM's failure to meet its duty to the Carbons, the Carbons have suffered severe emotional distress. By way of example, Kenneth has been diagnosed with depression, has lost interest in hobbies and activities he used to enjoy, has become more irritable, and has gained weight. Holly suffers from anxiety, has also become more irritable, has nightmares, and has experienced great difficulty in dealing with any of her friends who are pregnant. Holly also has become more cautious and has lost trust. Intimacy for the Carbons in their marriage is now difficult and less frequent. Holly and Kenneth both wake up frequently during the night.

74. The Carbons' mental and emotional distress suffered is the reaction of normally constituted persons facing the circumstances and losses caused by SRM's breaches of duty, negligent and/or reckless conduct in destroying, discarding, losing, or otherwise improperly disposing of the Carbons' last remaining viable embryo.

75. As a direct and proximate result of SRM's misconduct alleged herein, the Carbons have suffered severe emotional distress and damages in an amount well in excess of $75,000 and to be proven at trial.

/ / /

COMPLAINT AND JURY DEMAND - 12

Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224 | Fax 206.583.0359

2000080.02

## VII. FOURTH CAUSE OF ACTION - BAILMENT

76. The Carbons incorporate all preceding paragraphs by reference.

77. SRM's undertaking to store the Carbons' embryo constitutes a bailment for hire, or professional bailment. SRM had a duty of care with respect to the property that was the subject of the bailment, *i.e.*, the Carbons' embryo.

78. SRM owed the Carbons a duty based on SRM voluntarily undertaking to oversee and render cryopreservation, and storage services to the Carbons, and therefore had a duty to perform these services with a reasonable degree of care. SRM failed to meet its duty of care and has damaged the Carbons in an amount well in excess of $75,000 and to be proven at trial.

79. The Carbons are entitled to recover all damages as a result of SRM's breach of its duty of bailment.

## VIII. PRAYER FOR RELIEF

WHEREFORE, the Carbons respectfully pray for relief and judgment as follows:

1. Contractual, compensatory, emotional distress, consequential, and incidental damages in an amount to be proven at trial on the Carbons' claims for breach of contract, negligence, negligent infliction of emotional distress and bailment;

2. Costs of suit, including attorneys' fees, as may be authorized by statute, contract, or recognized basis in equity; and

/ / /

/ / /

/ / /

/ / /

/ / /

COMPLAINT AND JURY DEMAND - 13

Ryan, Swanson & Cleveland, PLLC
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3034
206.464.4224 | Fax 206.583.0359

2000080.02

1      3. Such further relief as this Court deems equitable, just, and proper.

2  Respectfully submitted this 17th day of September, 2019.

3             RYAN, SWANSON & CLEVELAND, PLLC

4             By */s/ Bryan C. Graff*
                 Bryan C. Graff, WSBA #38553
5                  1201 Third Avenue, Suite 3400
                Seattle, Washington 98101-3034
6                  Telephone: (206) 464-4224
                Facsimile: (206) 583-0359
7                  graff@ryanlaw.com

8             DGL LAW, PLLC

9             By */s/ Deirdre Glynn Levin*
                Deirdre Glynn Levin, WSBA #24226
10                 1300 N. Northlake Way, Suite 200
                Seattle, Washington 98103
11                 Telephone: (206) 422-6378
                deirdre@dgllaw.net
12
           *Attorneys for Plaintiffs*
13

14

15

16

17

18

19

20

21

22

23

COMPLAINT AND JURY DEMAND - 14



2000080.02